**Rafael Barcena NUNEZ, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 13–95–173–CR.**

Court of Appeals of Texas, Corpus Christi.

Feb. 13, 1997.

evidence before the trial court.

**58**

Richard B. Gould, McAllen, for Appellant.

Theodore C. Hake, Asst. Criminal District Attorney, Rene Guerra, District & County Attorney, Traci A. Sellman, Asst. Criminal District Attorney, Edinburg, for Appellee.

Before SEERDEN, C.J., and DORSEY and CHAVEZ, JJ.

## OPINION

CHAVEZ, Justice.

Appellant Rafael Nunez was convicted of murdering Paula Hernandez and sentenced to fifty years in prison. Prior to the trial, a competency hearing was held where a jury found that Nunez was competent to stand trial. Appellant's first point of error alleges that this finding was so against the great weight and preponderance of the evidence as to be manifestly unjust. We reverse the judgment and remand for further proceedings.

Appellant was arrested the same evening that Paula Hernandez was killed. While riding with the police to show them where he had left the knife used in the killing, Nunez explained that he had killed Hernandez because he believed she was a werewolf. Nunez told the police that he was an angel of God, and that he had acted under God's direction. He also told the police that he had intended to kill Hernandez's infant son, because he believed the child to be a vampire, but that he was unable to do so because he heard people coming before he had time to do it.

The trial court judge ordered Nunez to submit to psychiatric examination in preparation for a hearing to determine whether he was competent to stand trial. In Texas, the standard for whether a defendant is competent to stand trial is set out in Article 46.02 of the Code of Criminal Procedure:

Section 1. (a) A person is incompetent to stand trial if he does not have:

(1) sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding; or

(2) a rational as well as factual understanding of the proceedings against him.

TEX.CODE CRIM. PROC. ANN. art. 46.02, § 1(a) (Vernon 1979).

At a hearing to determine the competency of the defendant to stand trial, the defense bears the burden of proving the defendant's incompetency by a preponderance of the evidence. *McFarland v. State,* 834 S.W.2d 481, 486 (Tex.App.—Corpus Christi 1992, no pet.). On appeal, we review the entire record to determine whether the finding of competence is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Meraz v. State,* 785 S.W.2d 146, 155 (Tex.Crim.App.1990). When reversing on factual insufficiency, we must detail the relevant evidence and clearly state why the jury's finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Id.* at 154 n. 2.

Nunez was examined by three psychiatrists, all of whom testified that they considered him incompetent to stand trial. Dr. Elisa Sanchez testified that Nunez spoke to her only in a very limited manner and flatly refused to answer questions about his childhood and the crime he was accused of. Dr. Sanchez added that Nunez was generally uncooperative and seemed unable to focus his answers on the questions he had been asked. She indicated that he seemed to be responding to hallucinations. When asked whether Nunez could have faked the behavior that led her to consider him incompetent, she said did not believe that he had faked his symptoms because his behavior was not consistent with what psychiatrists expect from someone who is faking mental illness. As an example she noted that, although Nunez knew she had been informed of his story about Hernandez being a werewolf and hearing voices from God, he did not discuss these matters with her as he might have done if he were trying to persuade her that he was mentally ill.

Dr. Robert Collier examined Nunez next. He testified that Nunez's responses to his questions were garbled and disassociated. He believed Nunez's answers were the product of a delusional system wherein Nunez considers himself a representative of God and the armed forces against the agents of the devil. Nunez refused to discuss the offense with which he had been charged, and also became irritable and defensive when Collier raised the subject of Nunez's employment history. Nunez also demanded that Collier devise his own questions, implying that some other person or force was operating through Collier to ask the questions that it desired. Dr. Collier also testified that he did not believe that Nunez was faking his behavior, although he acknowledged that it was possible.

The day after Collier's examination, Nunez was examined by Dr. Diego Rodriguez. Rodriguez testified that Nunez's manner suggested that he was very suspicious of him, and that his answers were very evasive. Nunez refused to discuss the crime he was accused of or his employment history. At one point in the interview, Nunez pulled his shirt up to cover his face as part of his refusal to respond to Rodriguez's questions. Rodriguez indicated that he thought Nunez was responding to some internal stimulation, "something going on in his head." Rodriguez also testified that he did not believe Nunez was faking his symptoms, although he acknowledged that it is possible for people accused of crimes to feign mental illness in order to develop an insanity defense.

Testimony was also heard from Maria De Los Angeles Nunez, appellant's sister, and Maria De Carmen Nunez, appellant's mother. Appellant's sister testified that her family found it difficult to have conversations with the appellant because he "would jump into something that had nothing to do with what we were talking about." As a consequence, appellant's family frequently avoided talking with him. While in prison for a previous conviction, he sent letters addressed to Letty Valadez, a television newscaster, who he referred to as "Letty Nunez," because he considered her to be his wife, even though in reality they were not acquainted. While watching television he would argue angrily at the screen and his family was unable to distract his attention during these incidents. He would rarely go out of the house, but on occasion he would disappear for several weeks at a time, and when he returned he would indicate that he had hitchhiked hundreds of miles during his absence. Appellant's sister testified that these periods of absence were a relief to her family be-

cause of the stress his presence caused for them.

Appellant's mother testified that her son had acted strangely ever "since the time the police beat him up in Donna."[1] She testified that he talked and laughed by himself and made strange gestures with his hands. He also spent long stretches of time in front of the television, sometimes with the television turned off. She testified that her son was in love with television newscaster Letty Valadez in a way that she described as "disturbed." She testified that when she visited her son in jail after his arrest, his clothing was dirty and his hair was uncombed, and he communicated with her only to a very limited degree.

The State had intended to call only two witnesses at the competency hearing, Dr. Rodriguez and Dr. Collier. As both of them were called by the defense and the State was able to examine them on cross examination, the State rested without calling any witnesses. The case proceeded to jury argument and the jury returned a verdict that the defendant was competent to stand trial.

■ Appellant argues that, as all three experts testified that Nunez was incompetent and this testimony was further bolstered by the testimony of Nunez's mother and sister about his strange behavior, the jury's verdict that the defendant was competent was so against the great weight and preponderance of the evidence as to be manifestly unjust. In response, the State makes three points. First, the State urges that the appellant's refusal to discuss the crime he was accused of with the examining psychologists indicates his awareness of the proceedings against him, and suggests that the defendant was really a savvy veteran of the criminal justice system attempting to avoid being convicted. However, there was nothing unusual about his refusal to discuss the crime he was accused of. Both Dr. Rodriguez and Dr. Sanchez testified that he was reluctant to discuss any matters with them. The circumstances of the crime was not the only topic that caused a problem during the psychological examinations. He also refused to discuss his childhood with Dr. Sanchez and resisted dis-

cussion of his employment history with Dr. Rodriguez and Dr. Collier.

■ The State also notes the lack of testimony from appellant's trial lawyers about any difficulties they had communicating with their client. However, such testimony is not required to reverse a verdict of competency to stand trial when there is other evidence to demonstrate that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Aragon v. State*, 910 S.W.2d 635 (Tex.App.—Beaumont 1995, no pet.) (reversing verdict of competency without testimony from defendant's trial counsel); *see also Jackson v. State*, 857 S.W.2d 678 (Tex.App.—Houston [14th Dist] 1993, pet. ref'd) (same).

■ The State also argues that the expert testimony that the defendant was incompetent should not be considered conclusive. We agree that expert witnesses are not capable of dictating determination of the defendant's competency. *Graham v. State*, 566 S.W.2d 941, 949 (Tex.Crim.App.1978). However, there was very little evidence in this case to contradict the evidence from the experts and appellant's family that appellant was incompetent. Although the State tried to argue that appellant could have been faking his mental illness, they presented no evidence that he was faking, and all of the examining psychologists testified that they had considered whether Nunez was faking and decided that he was not. Although the State seeks to attach great significance to appellant's refusal to tell the examining psychologists about the circumstances of the crime he was charged with, a more balanced review of the evidence reveals that appellant was reluctant to speak with the psychologists about much more than just the circumstances of the crime.

Even if we were to accept the State's theory that appellant's refusal to discuss the circumstances of the crime indicates that he understood his situation as a criminal defendant and was trying to avoid divulging anything incriminating, the State has still presented no evidence to refute the defense's evidence that appellant was unable to consult with his lawyer with a rational degree of understanding. Dr. Collier testified that ap-

---

**1.** This incident occurred in 1986, approximately seven years before Paula Hernandez was killed.

pellant's speech was garbled and disassociated and the product of a delusional system. Dr. Sanchez testified that appellant was generally unresponsive to her questions, but did appear to be responding to hallucinations. Dr. Rodriguez also found appellant to be unresponsive to his questions, and thought that appellant was responding instead to internal stimulation. All were familiar with the legal standard for competency to stand trial and concluded that appellant was not competent under that standard. The experts' testimony that appellant was unable to consult with his lawyers with a reasonable degree of rational understanding was bolstered by the testimony of the appellant's sister, who testified that it was impossible to hold a conversation with appellant. The testimony of both appellant's sister and his mother suggested that appellant had experienced psychological problems for quite some time, and had not recently concocted his mental illness just to avoid being convicted.

Accordingly, we hold that the jury's verdict that appellant was competent to stand trial was so against the great weight and preponderance of the evidence as to be manifestly unjust and sustain appellant's first point of error. We REVERSE the judgment of the trial court and REMAND for a new competency hearing and a new trial.